IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TERRANCE PAYNE HAYES,<br><br>Defendant. | No. 23-CR-4068-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

Defendant Terrance Payne Hayes moves to suppress unwarned statements he made to law enforcement while confined to a hospital bed, as well as later warned statements he made at the police station after requesting to leave. Doc. 43. The Government resists. Doc. 48. I held an evidentiary hearing on July 1, 2024, at which Sioux City Police Department Detective Justus Knudsen testified. Doc. 55. I admitted the following exhibits without objection:

- **Government Exhibit 1:** Detective Knudsen's body camera video of July 17, 2023 interview;
- **Government Exhibit 2.1 and 2.2:** Detective Knudsen's body camera video of July 18, 2023 interview;
- **Government Exhibit 3:** Detective Knudsen's body camera video of July 24, 2023 interview;
- **Government Exhibit 4.1 and 4.2:** Video recording of August 11, 2023 interview; and
- **Defense Exhibit A:** Defendant's medical records (sealed) (Doc. 54).

I recommend **denying** Hayes's motion to suppress (Doc. 43).

## I. FACTS AND BACKGROUND[1]

In the early morning hours of July 17, 2023, the Sioux City Police Department received a 9-1-1 call from Hayes's wife, Amanda. An intruder had kicked down the door to their house armed with knives and stabbed Hayes. Hayes shot the intruder. When law enforcement arrived, both men were seriously injured, and they were taken to the hospital.

A little over an hour later (around 5 in the morning), Detective Knudsen and another detective talked to Hayes at the hospital before he underwent surgery. Hayes stated he did not know the intruder or the reason for the attack. Hayes denied owning a firearm (he is a felon). He stated he shot the intruder with a gun taken from the man's own waistband. The interview lasted six minutes.

The next day, Detective Knudsen and two other detectives (all in plain clothes) returned to the hospital in the afternoon to talk about the attack with Hayes. Hayes lay in his hospital bed, hooked to monitors and tubes as he recovered from surgery. The detectives stood around his bed. They began by asking Hayes how he was feeling, and Hayes said not great. They then asked Hayes to describe what had happened the day before. Hayes said he heard his wife screaming from another room, and when he ran to her aid, he saw a man in their house armed with two knives. Hayes said he and his wife fought the intruder until Hayes managed to remove the firearm from the intruder's waistband and use it to shoot him.

Around thirty-two minutes into the interview, while discussing what happened during the altercation, Hayes said "you guys know what kind of person I am," that he's the kind of person who tries to deescalate situations, to which a detective said he had

---

[1] The facts in this section are taken from the testimony at the suppression hearing and the exhibits admitted into evidence.

spoken with Hayes "plenty of times and would agree with that."[2] Around thirty-nine minutes into the interview, Hayes asked if the intruder had died from the gunshot wounds. When he learned the man had not survived surgery, Hayes looked upset and covered his face with his hospital gown. Detective Knudsen left the room to ask hospital staff for tissues, noting the interview would likely last an additional ten to fifteen minutes. When Detective Knudsen returned to the room, another detective was telling Hayes that he believed there was more to the story, noting Hayes might not know additional information, but people generally did not go around kicking down doors to random houses armed with knives.[3] Law enforcement then pressed Hayes about where the gun had come from, suggesting they did not believe the gun belonged to the intruder. Under repeated questioning, Hayes admitted that a man named Mikey had brought the gun to his house about a week prior to the attack and that his shoes were there too (after law enforcement asked Hayes who Mikey was). Law enforcement continued questioning Hayes about the previous day's events. A little over an hour into the interview, law enforcement stated they should let Hayes rest, but Hayes stated he was good. The detectives ultimately talked with Hayes for an hour and twenty minutes.

After Hayes's discharge from the hospital, Detective Knudsen visited Hayes's residence on July 24, 2023. He obtained a release for Hayes's medical records and talked about the attack with Hayes and his wife Amanda in their living room for thirty minutes. Amanda said Mikey had robbed an associate of the intruder's and led him to believe Hayes had the stolen property. Detective Knudsen said law enforcement believed Mikey had stolen a firearm. Hayes denied ever owning a gun, and Detective Knudsen reminded him that law enforcement already knew the gun had been at his house before in a shoebox.

---

[2] In addition to this indication that Hayes had previously spoken with police, the Pretrial Services Report (Doc. 17) outlines Hayes's extensive criminal history.

[3] Defendant's brief contains a helpful transcript of this portion of the recording, from 40:05 to 47:46 (Gov't Ex. 1).

3

Hayes responded Mikey brought the gun. Detective Knudsen asked whether Mikey had stolen the gun, and Hayes said he had no idea.

At the hearing, Detective Knudsen testified that Hayes had been viewed as a victim of a crime, rather than a suspect, during these interviews. But by the fourth interview in August, law enforcement had learned additional information, including that the firearm used to shoot the intruder had been stolen. Theories for the intruder's motive for coming to Hayes's house included that the attack was part of a gang initiation, that the intruder sought to recover the stolen firearm, or that Hayes had set the intruder up to rob him.

Midday on August 11, 2023, Detective Knudsen went to the Hayes residence and brought Hayes and his wife to the police station for an interview.[4] Detective Knudsen interviewed Hayes in a separate room from his wife. At the beginning of the interview, Detective Knudsen told Hayes that he still looked at him as the victim, and Hayes started talking about what happened the night of the shooting. Detective Knudsen said that before they got too far into it, he wanted to read Hayes his rights. Detective Knudsen explained that Hayes was obviously not detained and could stop talking at any time. Detective Knudsen then read Hayes his *Miranda* rights, explaining that he informed everyone of their rights before an interview at the police station. Hayes indicated that he understood his rights. When Detective Knudsen asked if he was willing to talk to him, Hayes stated he was the victim, and Detective Knudsen agreed. Hayes then signed the *Miranda* waiver.

Detective Knudsen interviewed Hayes for fifty minutes, and Hayes repeatedly asserted the gun belonged to the intruder. As Detective Knudsen questioned Hayes on the assailant's motives for choosing his house to attack, Hayes said that there was too

---

[4] Neither party elicited testimony at the suppression hearing on the interaction between Detective Knudsen and Hayes on August 11 prior to the recorded interview at the police station, beyond that Detective Knudsen went to Hayes's residence and "picked him up and transported him to the police station" and "retrieve[d] him and brought him to the police station."

4

much going on in his head and that he was "ready to go." Gov't Ex. 4.1, 51:20. Detective Knudsen said he would check to see if Amanda's interview was finished and asked if Hayes needed a water. Hayes asked if he could wait outside in the hallway, and as Detective Knudsen said, "uh...," Hayes got up and walked out the door, noting the interview room was hot. The video shows Hayes stepped out into the hallway for ten seconds before Detective Knudsen ushered him back into the interview room. Hayes said, "That's why I don't like coming down here. If I'm not being detained, I would like to go." Detective Knudsen responded that Amanda's interview would be done soon and then they would get him out of there. Hayes sat in the interview room by himself with the door closed for four minutes, then Detective Knudsen returned with Detective Sitzman to play "bad cop."

The detectives sat down and told Hayes they were "almost done," but first, they needed to go back to what Hayes said in the hospital about the gun.[5] Detective Sitzman said video of the intruder showed he could not have had a gun in his waistband. He said he did not want a murder investigation when Hayes acted in self-defense, but if he was going to sit there and lie to them, they would switch gears. Hayes questioned law enforcement's theory that the intruder sought to recover a stolen firearm, asking why the intruder would have come armed only with knives if he knew Hayes had a gun. Detective Sitzman asked why Hayes's fingerprints were on the magazine then. Hayes said he did not know and did not commit murder. Detective Sitzman responded that if it was not murder, Hayes should cooperate. Hayes again said, "If I'm not being detained, I'd like to go." Detective Sitzman said, "Then we're going to switch gears and I'm just warning you that we're going to probably turn this into a murder investigation." Hayes said

---

[5] Defendant's brief contains a transcript of this portion of the recording, from 56:06 through the end of Government Exhibit 4.1, and from the beginning of Government Exhibit 4.2 through 4:24. I note that a statement from Detective Sitzman around 56:30 (Gov't Ex. 4.1) seems to have been inadvertently omitted from the transcript.

5

something about acting in self-defense against an intruder who broke into his house, and Detective Sitzman said aggressively, rising from his chair, "And now he's dead and you're lying about the murder weapon." Hayes responded that he was not lying about anything. Detective Sitzman said that they were giving Hayes the opportunity to explain and instead he was acting like he had something to hide.

Detective Sitzman opened the door to the interview room, and Sergeant Sanders entered. There were now three officers in the small interview room, Sergeant Sanders standing in between Hayes and the door, Detective Sitzman standing next to him, and Detective Knudsen sitting to the right of Hayes. Sergeant Sanders asked if Hayes was scared, and he said he was not. Sergeant Sanders said he understood why Hayes had the gun, since he would be dead without it. Hayes denied having the gun. Sergeant Sanders said that they were not trying to "jam [him] up" and that they did not "care where the gun came from," but that they needed to know where the gun had been in the house prior to the shooting. Sergeant Sanders reiterated that if Hayes kept being dishonest, the self-defense case would become a murder case. Sergeant Sanders then left the room (Detectives Knudsen and Sitzman remained, both sitting down). Detective Knudsen said they needed to figure out why the intruder chose Hayes's house, and the evidence pointed to the firearm. Detective Sitzman said they did not care that Hayes knew Mikey had left the gun at his house or that Hayes was a felon, but they had to be able to track where the gun came from to determine whether Hayes acted in self-defense or whether he called the home intruder over to rob him. Hayes then talked to the detectives (primarily questioned by Detective Sitzman) for an additional twenty minutes about the firearm and how it came to be in his possession. When Detective Sitzman said he was done with the interview, Detective Knudsen asked Hayes, "you're ready to go, right?" Hayes said he was. Detective Knudsen said he would find Amanda, and he propped the door to the interview room open for Hayes in the meantime. Hayes waited in the interview room

6

for five minutes, then the detectives came back, ready to drive him and Amanda home. Law enforcement did not arrest Hayes or his wife at the conclusion of questioning.

The grand jury indicted Hayes on firearms charges in November 2023 (possession of a firearm by a felon, drug user, and person convicted of domestic violence; and possession of a stolen firearm). Doc. 3. I found good cause to reset the pretrial-motions deadline, which the district judge affirmed on appeal. Docs. 32-33, 36, 44-47. Hayes moves to suppress the statements he made from his hospital bed the day after the attack (on July 18) and after law enforcement denied his requests to leave the voluntary interview (on August 11), in which he admitted the firearm was at his house before the intruder's arrival.

## II. DISCUSSION

### A. Hospital Interview

Under *Miranda*, a suspect subject to custodial interrogation must first be advised that he has the right to remain silent and the right to an attorney, and he must waive these rights before the interrogation can proceed.[6] Hayes argues that he was "in custody" for purposes of *Miranda* during the July 18 interview because he was confined to his hospital bed, but law enforcement did not advise him of his rights. "The government bears the burden of proving by a preponderance of the evidence that a defendant's statements were not the product of a custodial interrogation."[7]

---

[6] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

[7] *United States v. Koons*, No. CR00-3041-MWB, 2001 WL 34008498, at *8 n.1 (N.D. Iowa Apr. 26, 2001) (citing *Miranda*, 384 U.S. at 475); *see also Holman v. Kemna*, 212 F.3d 413, 419 (8th Cir. 2000) ("constru[ing] the ambiguity in the record in favor of [the defendant to] . . . conclude that [the defendant] was subject to interrogation); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1097-98 (D.S.D. 2010) (adopting report and recommendation) (noting that district courts are split regarding the burden of proof and that the Eighth Circuit has not addressed the issue).

7

A suspect is in custody for purposes of *Miranda* upon "formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest."[8] The test is not subjective but rather, depends on "how a reasonable [person] in the suspect's position would have understood [the] situation."[9] The totality of the circumstances must be considered, including the following (nonexhaustive) factors:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.[10]

These factors are not "dispositive," however, and are "merely one means of analyzing" the ultimate question[11]—"whether a reasonable person in that position would have felt free to end the interview."[12]

---

[8] *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *California v. Beheler,* 463 U.S. 1121, 1125 (1983)).

[9] *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 429 (1984)).

[10] *United States v. Duggar*, 76 F.4th 788, 793 (8th Cir. 2023) (cleaned up) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)); *see also* *Howes v. Fields*, 565 U.S. 499, 509 (2012) (relevant factors to determining custody include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning" (citations omitted)).

[11] *United States v. Rezac*, No. 3:16-CR-30051-RAL, 2017 WL 2536540, at *3 (D.S.D. June 9, 2017) (adopting report and recommendation).

[12] *United States v. Aldridge,* 664 F.3d 705, 711 (8th Cir. 2011); *see also* *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (noting that when defendant was confined to a hospital bed

8

Here, law enforcement did not inform Hayes that he could decline to be interviewed or ask them to leave (the first factor). And law enforcement came to Hayes and initiated questioning (the third factor). But the other factors weigh against a finding of custody. Although Hayes was immobile as the result of his physical condition, in weighing the third factor, the court "focus[es] on the restraint imposed by the government agents."[13] "[T]o the extent [Hayes] felt constrained by his injuries, the medical exigencies they created (e.g., the donning of a hospital gown and the insertion of an I.V. line), or the routine police investigation they initiated, such limitations on his freedom" would not have affected a reasonable person's view that he could decline the interview and ask the officers to leave.[14] Three officers were present for the interview, but they talked to Hayes in measured tones and did not threaten to investigate Hayes for murder if he was noncooperative (as with the later interview). Law enforcement did repeatedly question Hayes's story that the gun belonged to the intruder, suggesting that they would discover his fingerprints on the interior magazine or bullets and that Hayes's story did not align with other witness statements. They also suggested Hayes would not be arrested on gun charges, repeatedly stating their focus was on the intruder's motive for the attack (which law enforcement believed might have been to recover the stolen firearm). But when officers readied to leave about an hour into the interview, Hayes encouraged them to stay. Overall, I do not find that the atmosphere was police dominated. Law enforcement did not place Hayes under arrest at the conclusion of questioning. A reasonable person in Hayes's position would have believed that law enforcement was

---

and physically unable to leave, the ultimate question was whether a reasonable person would have felt free "to terminate the interrogation and cause the agent to leave").

[13] *New*, 491 F.3d at 373.

[14] *United States v. Jamison*, 509 F.3d 623, 629 (4th Cir. 2007).

9

investigating the armed break in (and that they perhaps knew the break in was targeted), but not that he was under arrest or anything other than a victim at that point.

I recommend finding that Hayes was not in custody during the interview in his hospital bed and that *Miranda* warnings were therefore not required.

### B. Police Station Interview

In his original motion, Hayes argued that "[b]y threatening [Hayes] with the prospect of a trumped-up murder prosecution, detectives were able to coerce [Hayes] into confirming prior *un-Mirandized* statements from his hospital bed, made upon the promise that he would not be prosecuted for a firearms offense." Doc. 43-1. At the hearing, Hayes additionally argued that he invoked the right to silence when he stated he wanted to leave the interview.

The Fifth Amendment right against self-incrimination and the Due Process Clause requires the government to prove a confession is voluntary before it can be used against the defendant at trial.[15] "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."[16] In *Miranda*, the Supreme Court recognized the "inherent[ly] compulsi[ve]" nature of custodial interrogations, as police frequently employ interrogation techniques designed to psychologically pressure suspects into confessing.[17] To combat these pressures and ensure confessions are made voluntarily, the Court required *Miranda* warnings prior to interrogating a suspect in custody, and a violation of the *Miranda* rule requires suppression of the statement. But the corollary is that in the absence of a *Miranda* violation, it is "rare" (although not

---

[15] *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (en banc).

[16] *Id.* at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)).

[17] 384 U.S. at 448-55, 467.

impossible) to find the defendant's will overborne and a statement involuntary.[18]

The court "determine[s] if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure."[19] Relevant "[f]actors include 'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'"[20] Interrogation "'[t]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, . . . deceiving the suspect, conveying sympathy, and even using raised voices,' do not 'render a confession involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne."'"[21]

Here, Hayes received *Miranda* warnings at the beginning of the police station interview and agreed to talk. He argues that his confession was involuntary because when he said he wanted to leave, he was threatened with murder charges. He also argues that law enforcement promised not to charge him with being a felon in possession. Threatening criminal charges if a suspect does not talk or promising leniency if he does

---

[18] *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (plurality opinion) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)).

[19] *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005)).

[20] *Id.* (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)).

[21] *Id.* (cleaned up) (quoting *Brave Heart*, 397 F.3d at 1041); *see also Miranda*, 384 U.S. at 448-55 (*Miranda* rule implemented to combat common interrogation tactics of isolating suspect in interview room; positing guilt as a fact; offering a legal excuse for the suspect's acts, such as self-defense; questioning suspect for hours with breaks only to avoid duress charges; using a good cop/bad cop routine; tricking the suspect with fake evidence suggesting guilt; and acknowledging the right to silence when invoked but suggesting exercising that right would make it look like the suspect had something to hide).

are relevant factors, but neither render a confession per se involuntary.[22] And here, law enforcement threatened a murder *investigation*, rather than a murder *charge,* which somewhat lessens the coercive nature of the statement. In addition, the statement was truthful in that law enforcement were already investigating Hayes for murder (believing he might have lured the intruder to his home to rob him).[23] Law enforcement did not outright promise Hayes would not face firearms charges, although they did suggest they did not care that he possessed a gun as a felon and that they were not interested in bringing gun charges against him (Hayes is currently charged with being a felon in possession and possessing a stolen firearm). Overall, here, considering the totality of the circumstances—including the relatively short length of the interrogation (an hour and a half total) and Hayes's familiarity with the criminal justice system—I do not find the interrogation tactics so coercive as to overbear Hayes's will.[24] I recommend finding that Hayes's confession was voluntary.

---

[22] *See United States v. Englehart*, 811 F.3d 1034, 1043 n.3 (8th Cir. 2016) ("[A] promise made by law enforcement not to arrest or prosecute does not render a confession involuntary." (quoting *United States v. Thunderhawk,* 799 F.3d 1203, 1206 (8th Cir.2015))); *United States v. Williams*, 793 F.3d 957, 962-63 (8th Cir. 2015) (holding that even if officer "threaten[ed] to charge [defendant] with obstruction of justice if [defendant] refused to speak with police, . . . . such a threat would not automatically render [defendant's] statement involuntary"); *United States v. Mendoza*, 85 F.3d 1347, 1351 (8th Cir. 1996) ("statement that [defendant] would be arrested immediately if she did not cooperate . . . . was not so coercive as to deprive [defendant] of her ability to make an unconstrained decision to confess").

[23] *Cf. United States v. Sanchez*, 614 F.3d 876, 884 (8th Cir. 2010) (rejecting factual finding that officers "threatened [suspect] with charges of attempted murder and assault with a deadly weapon" when defendant was later charged with the latter offense; the court held "[t]his was not a threat, but rather a truthful response" to a question about why defendant would be going to jail (quoting *United States v. Murdock,* 491 F.3d 694, 699 (7th Cir. 2007))).

[24] *See also United States v. Simpson*, 44 F.4th 1093, 1097-98 (8th Cir. 2022) (confession voluntary despite "repeated requests to go home").

12

A closer issue is whether Hayes was in custody and invoked his right to silence. Up until the point Hayes stated he wanted to leave, he was not in custody. The court has no information on how Hayes came to be at the police station—other than that Detective Knudsen "retrieved" him from his house and transported him there. But at the beginning of the interview, Detective Knudsen told Hayes he was not being detained and could stop the interview at any time. Hayes was not in handcuffs. His path to the door was not blocked. And the interview at first consisted of a single officer (Detective Knudsen) asking Hayes questions in a congenial tone as a victim of a crime.

But a reasonable person would have felt differently once Detective Sitzman entered the room. By that point, Hayes had told Detective Knudsen he wanted to go and had even tried to leave the interview room, only for Detective Knudsen to gesture him back inside.[25] Instead of allowing him to leave, Detective Knudsen retrieved another detective, and the tone of questioning shifted to suggest Hayes had committed murder rather than been a victim acting in self-defense. When Hayes reiterated that he wanted to leave if he was not being detained, Detective Sitzman responded they would "switch gears" and the investigation would become one for murder. He also repeatedly accused Hayes of lying about the murder weapon and stood up so that Hayes would have had to pass him to reach the door. And shortly thereafter, a third officer (Sergeant Sanders) entered the room and stood in between Hayes and the door.

Almost all the *Griffin* factors weigh in favor of a finding of custody. Strong arm tactics were used and the atmosphere became police-dominated. Despite being told at the beginning of the interview he was free to leave at any time, law enforcement ignored Hayes's requests to leave and even ordered him back into the interview room; this is not a case in which law enforcement reminded him he could leave any time in response to

---

[25] Detective Knudsen also perhaps told him to wait in the interview room; the recording does not capture what was said during the ten seconds Hayes was in the hallway.

13

his request to leave[26] or ended the interview within minutes of the request.[27] Although not handcuffed, Hayes did not have freedom of movement, since he was not allowed to wait in the hallway (or lobby or parking lot) for his wife. Law enforcement initiated the interview. Hayes was not arrested at the conclusion of the interview, but the Eighth Circuit has recently recognized this factor does not weigh heavily in favor of a finding of custody:

> It is not clear why [an arrest at the end of questioning should be an indicium of custody] when the suspect does not know that an arrest is forthcoming: custodial status depends on whether a reasonable person would feel free to leave during the interview. As *Griffin* itself explained [quoting a Supreme Court case], "[t]he rule is that 'a policeman's unarticulated plan has no bearing on the question of whether a suspect is in custody at a particular time; the one relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'"[28]

---

[26] *Cf. United States v. Simpson*, No. 8:18CR333, 2020 WL 7130589, at *4-5, *10-11 (D. Neb. Aug. 27, 2020) (*Simpson R&R*) (defendant was not in custody when he came in for a voluntary interview then later repeatedly said he wanted to go home; officers told him multiple times he was free to leave any time in response to his statements about wanting to go home, defendant rose to leave multiple times but then sat back down again to continue the interview, and defendant was interviewed by one officer in an environment that was not police dominated), *report and recommendation adopted,* 2020 WL 5835134, at *2 (Oct. 1, 2020) ("Because [d]efendant was informed numerous times that he was free to leave and waived his *Miranda* rights; was not handcuffed or physically restrained and allowed to leave the interview room for bathroom and cigarette breaks; agreed to meet [the agent] at the police department; was not deceived or coerced into responding to questions; and was not arrested at the termination of the questioning, he was not in custody."), *aff'd,* 44 F.4th at 1097 (declining to consider custody question).

[27] *Cf. United States v. Sharkey*, No. 3:22-CR-30045-RAL, 2023 WL 3495385, at *5, *7-8 (D.S.D. May 17, 2023) (when defendant came to police station for voluntary polygraph test and was told he could stop questioning any time, he was not in custody for duration of hour-long post-polygraph interview by two detectives, despite "use of strong-arm tactics or deceptive stratagems"; "[s]hortly after" (four minutes) defendant "finally said he wanted to go home, questioning ceased and [defendant] left").

[28] *United States v. Treanton*, 57 F.4th 638, 641 (8th Cir. 2023) (quoting *Griffin*, 922 F.2d at 1356); *but see Howes*, 565 U.S. at 509 (listing release after questioning as relevant factor).

14

Here, a reasonable person would not have felt free to end the interview and leave once requesting to leave and being prevented from leaving the interview room, despite earlier assurances the interview was voluntary.

Hayes argues that his requests to leave amounted to an invocation of the right to silence. "During an interrogation, 'if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'"[29] "A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'"[30] "To say that a person must clearly and consistently assert his desire to remain silent does not mean that he must repeat his clearly asserted desire to remain silent in order to halt continued questioning."[31] "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*."[32] The court "consider[s] the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent,"[33] but "may not construe a defendant's assertion of *Miranda* rights to be ambiguous by looking only to subsequent responses to police questioning."[34]

---

[29] *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (cleaned up) (quoting *Miranda*, 384 U.S. at 473-74).

[30] *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) (per curiam) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)).

[31] *Simmons*, 235 F.3d at 1132 n.3.

[32] *Ferrer-Montoya*, 483 F.3d at 569; *see also Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (invocation of right to silence must be unambiguous).

[33] *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995).

[34] *Simmons*, 235 F.3d at 1132 n.3 (citing *Smith v. Illinois*, 469 U.S. 91, 97-99 (1984) (per curiam)).

There are no magic words that must be spoken to constitute an invocation of the right to silence.[35] "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to" remain silent "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be" an invocation.[36] For example, "say[ing] that he wanted to remain silent or that he did not want to talk with the police" are "simple, unambiguous statements" that invoke the "right to cut off questioning."[37] On the other hand, the Supreme Court has held that remaining silent for the first two hours and forty-five minutes of a three-hour interrogation does not invoke the right to silence.[38] And the Eighth Circuit has held no invocation when a defendant said, "I don't want to talk, man. I mean, I," because "[t]he phrase 'I mean' signaled that [defendant] intended to clarify the statement, 'I don't want to talk, man,'" rendering it ambiguous.[39]

In *United States v. Simpson*, the Eighth Circuit held that when defendant came to the police station for a voluntary interview, his "repeated statements that he wished to go home were not unambiguous invocations of his right to remain silent."[40] The court reasoned that "'[t]he prospect of going home would naturally be of great interest to any

---

[35] *See Seibert*, 542 U.S. at 611 ("[N]o talismanic incantation is required to satisfy *Miranda's* strictures . . . ." (cleaned up) (quoting *California v. Prysock,* 453 U.S. 355, 359 (1981) (per curiam))).

[36] *Davis v. United States,* 512 U.S. 452, 459 (1994) (citation omitted) (quoting *id.* at 476 (Souter, J., concurring)) (discussing right to an attorney); *see also Berghuis*, 560 U.S. at 381 ("[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*.").

[37] *Berghuis*, 560 U.S. at 382.

[38] *Id.* at 375-76, 382.

[39] *United States v. Adams*, 820 F.3d 317, 320, 323 (8th Cir. 2016).

[40] 44 F.4th at 1097.

16

suspect undergoing interrogation,' but . . . a statement about wanting to go home [does not] 'evidence[] a refusal to talk further.'"[41] The court relied on an Eleventh Circuit case in which the court held defendant did not invoke the right to silence by asking, "When will you all let me go home?"[42] The Eleventh Circuit reasoned that defendant was requesting "information about when, in the future, [he] would be allowed to leave," rather than "attempt[ing] to cut off questioning."[43]

*Simpson* could perhaps be distinguished as involving a request to go home, rather than a more general request to leave. In addition, the underlying district court opinion sets forth distinguishing facts based on the entire interaction between the defendant and the interrogating officer, including that the interviewing officer responded to an early request to go home by saying he was not blocking the door and reminding defendant he was free to leave any time; and that defendant rose from his chair to leave several times, only to sit back down again to continue the conversation.[44] But the Eighth Circuit opinion does not mention these facts. Neither does it seem to rely on (or mention) the "clear error" standard of review.[45] The Eighth Circuit's opinion in *Simpson* paints with broad strokes and holds that when a suspect says he wants to go home—which would necessarily end the interview—he does *not* unambiguously indicate that he wants to end the interview. As the Ohio Supreme Court has explained:

> Obviously, if [defendant] had gone home, he would also have stopped talking to the police. What is not clear, however, is whether his readiness to stop talking was independent of his desire to go home. What [defendant]

---

[41] *Id.* (quoting *Moore v. Dugger*, 856 F.2d 129, 134 & n.1 (11th Cir. 1988)).

[42] *Moore*, 856 F.2d at 134 & n.1.

[43] *Id.* at 134.

[44] *Simpson R&R*, 2020 WL 7130589, at *5, *11.

[45] *United States v. DeMarce*, 564 F.3d 989, 993 (8th Cir. 2009) ("Whether a person invoked his right to remain silent is a factual question for the district court, reviewed for clear error.").

17

appears to have wanted was to be released. Talking to the police was a means to that end; he was trying to persuade them that he was innocent. Thus, his words did not necessarily mean that he wanted to stop talking, no matter what. If the police were not ready to let him go, he may well have wanted to keep trying to persuade them of his innocence.[46]

Here, law enforcement told Hayes he was at the police station for a voluntary interview as a victim and could leave any time (so the Ohio Supreme Court's reasoning does not necessarily apply—to Hayes or the *Simpson* defendant). Detective Knudsen read Hayes his *Miranda* rights as a formality. After an hour, Hayes said there was too much going on in his head and he was ready to go. He tried to exit the interview room but was made to wait, to which he said, "If I'm not being detained, I would like to go." And when another officer came in and accused him of murder, rather than self-defense, Hayes again said, "If I'm not being detained, I'd like to go." To me, it seems clear that Hayes wanted to cut off questioning. But if remaining silent for two hours and forty-five minutes is ambiguous, and saying over and over again that you want to go home is ambiguous, then I feel bound by precedent to find that Hayes's requests to leave were ambiguous. Distinguishing *Simpson* as involving a request to go home, rather than a request to leave, end stop, would be disingenuous; the reasoning underlying *Simpson* applies with equal force to Hayes's request here.[47]

---

[46] *State v. Murphy*, 747 N.E.2d 765, 779 (Ohio 2001).

[47] *See also* **Delap v. Dugger**, 890 F.2d 285, 290-93 (11th Cir. 1989) (when officer testified at suppression hearing that defendant said during interview "he wanted to know how much longer that he would be detained or would be there answering questions," and "said that his wife was home alone with the children, . . . expecting him home," and "he wanted to go," the court held that defendant's "questions" did not invoke right to silence, as "the context . . . was not whether or not [defendant] wished to terminate or delay questioning, but rather whether or not [defendant] felt like he was free to go home"), *abrogated on other grounds; see also* **Berghuis**, 560 U.S. at 411 & n.9 (Sotomayor, J., dissenting) (collecting cases in which courts have "rejected as ambiguous an array of statements whose meaning might otherwise be thought plain," including a Kansas Supreme Court case in which defendant said, "and since we're not getting anywhere I just ask you guys to go ahead and get this over with and go ahead and lock me up and let me go

I recommend finding that Hayes did not unambiguously invoke the right to silence.

### III. CONCLUSION

I respectfully recommend **DENYING** Hayes's motion to suppress (Doc. 43).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[48] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[49] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[50]

**DATED** July 23, 2024

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

and deal with Sedgwick County, I'm ready to go to Sedgwick County, let's go" (cleaned up) (quoting *State v. Speed*, 961 P.2d 13, 24 (Kan. 1998))).

[48] **LCrR 59**.

[49] *See* **Fed. R. Crim. P. 59**.

[50] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).